SPRING 1811. *SYNDICS OF AMELUNGS' vs. BANK OF THE*
First District. *UNITED STATES.*

The Bank of the U. S. had no lien on notes deposited for collection.

THE plaintiffs claimed sundry promissory notes deposited in the defendants' office of discount and deposit, by the insolvents prior to their failure, which the defendants retained, claiming a lien thereon for monies due them by the insolvents.

IT was admitted that the insolvents, before and till the period of their failure, had dealings with the defendants, depositing gold, silver, bank bills, and notes and bills for collection, which gold, silver and bank bills and the proceeds of the notes and bills for collection, were placed to the insolvents' credit, in their account with the defendants. The insolvents, from time to time, applied and received from the defendants discounts on their own bills or notes, the net proceeds of which were placed to their credit, and the full amount of said bills or notes at maturity carried to their debit. The defendants regulate the accommodation, which they extend to their customers, by the usual course and amount of their respective pecuniary dealings and transactions with the defendants : keeping an account of such dealings, with each customer, and at the maturity of his notes, discounted by the defendants, debiting him therefore, appropriating for this purpose, as much as is necessary of the customer's money in the

hands of the defendants, proceeding from deposits or collections, without any protest or demand, when the money at the customer's credit suffices. The insolvents' failure was made public about, and the plaintiffs were appointed their provisional syndics on, the 22d of February. On the 28th and on the following days, notes of the insolvents, and of other individuals whose endorsers they were, were protested to a considerable amount. There was no evidence of the precise day, on which the plaintiffs made a demand of the notes which are the subject of the suit. On the day on which it was brought, the insolvents had to their credit, on the defendants' books and in their hands, monies, notes or bills for collection, to a considerable amount, but the insolvents were indebted to the defendants, as drawers and endorsers, to a sum more than double that to their credit, leaving a great excess of debt, even if all the notes deposited for collection proved good.

*Smith* for the defendants. The defendants had a lien upon these notes for the general balance of account due from the insolvents,

1. Upon principle,
2. Upon authority.

I. On the first ground, a *lien*, in the ordinary acceptation of the term in the English law, may be defined to be a hold, which a person has upon the goods or property of another, and which he

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
*vs.*
BANK U. S.

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
vs.
BANK U. S.

has a right, at least to detain until payment of what is due to him from the owner; generally arising upon possession, and expiring with it.

LIENS are supported by natural equity, and certainly are highly favorable to commerce. They seem to rest in part upon the same equity with that of deciding, as far as possible, cross demands in the same action, rather than turning parties round to seek their remedies in distinct suits. The time was, before the influence of trade and of general intercourse had produced their due effect in softening the harsh and inconvenient rules of law, when every right required to be asserted in a distinct action and of consequence when remedies were often circuitous, difficult and defective. Perhaps the law of England even yet may not be quite sufficiently unfettered on this subject, to afford all the encouragement that the varied and complex relations of commerce require. But that a factor has a lien upon goods in his possession, not only for incident charges, but as an item of mutual account for the general balance, must be admitted to be law there as well as here. The first solemn decision on the subject [ *Krutzer* vs. *Wilcox*, referred to in 1 *Burr*. 494. ] was so evidently equitable and beneficial to commerce, that it has been ever since referred to as a standard case. It is equally law there that a banker has a lien for his general balance upon all paper securities of a customer that may happen to be in his hands. 5. *T. R.* 488.

*Ib.* 494. 1 *Esp.* 66. It is now decided also, that a packer, being in the nature of a factor, has an equal lien upon goods sent to him to be packed, *ex-parte Deeze.* 1 *Atk.* 228. So too, of calico-printers as to goods in their hands to be printed. *Cook's B. Laws.* 515. And wharfingers have now been decided to have a lien upon goods in their possession, not only for wharfage, but for a general balance of account. 1 *Esp.* 109, and such is the force of this equitable right of lien, that it has been decided to hold in favor of a balance, including debts of which the recovery might otherwise be barred, by the statute of limitations. 3 *Esp.* 81. And the lien of an insurance broker, upon a policy, is now decreed to be equally general and even though he may have parted with the possession of it, provided he afterwards, by any means whatever, have recovered it. *Cook's B. L.* 349.

AND so strongly do the courts of England incline in favor of liens, that they are now supported, not only when they are founded upon express contract, but whenever a contract is implied from the usage of trade or from the manner of dealing between the parties. From the course of these decisions, the doctrine of liens, as established in favor of factors, seems to be evidently widening every day, and perhaps may, at no very distant period, be established as the general law, in favor of almost every species of agent,

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
*vs.*
BANK U. S.

Spring 1811.
First District.

Amelungs'
Syndics
*vs.*
Bank U. S.

and wherever almost there are mutual dealings and demands of any sort, at least in the event of bankruptcy or death.

But what is the reason of the law in favor of a factor's right to detain? There is no express agreement between the factor and his principal—The law implies such an agreement from the relations between them—from the mutual dealings and accounts—from the continual receiving and paying—from the mutual debts and credits—it being equitable that the goods in the hands of the factor should enter as items into the mutual account, of which nothing but the general balance ought to be the debt between them. The factor is *in possession*, and he is presumed, in virtue of that possession, to have relied on it as a security. If the merchandize in his hands were sold and reduced into money, then, clearly there would be by mere operation of law, an instant compensation of the amount of the general balance by the funds in his hands ; so far, as they would go, and the reason of the law is equally in support of the right to detain. It has been long ago decided, that if a first mortgagee lend a further sum upon a third mortgage, without notice of the second, he shall retain in preference to the intervening mortgagee, until both his securities be paid—because, as it is to be presumed, that in lending his money upon the third mortgage, he relied upon the hold, he already had upon the land by the first,

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
vs.
BANK U. S.

2 *P. Wms.* 494, it is equitable that he should retain. Possession, united with this equity, overcomes the strong equity in favor of the second mortgagee, who must be presumed to have advanced his money upon a knowledge of the sufficiency of the land, to discharge both the previous incumbrance and his own. On the same principle, a trustee of land, having in him of course merely the legal estate and possession of the titles, shall retain them, until paid not only expences incident upon the trust, but every other debt since contracted to him by the *cestui que trust*, and whether it was or was not incurred with any reference to the trust estate as a security. 1 *Binney* 126, *Lessee of Frazer & al.* vs. *Hallowell.*

WHAT has been said of a factor, is equally applicable to a banker, in their respective relations.

AND the condition of a broker or a factor, seems to bear a perfect ressemblance to that of the defendants, in the point of view in which they must be regarded for a decision of this question. Between the defendants and the insolvents, there was mutual dealing—mutual receiving and paying—mutual credit given—and a general running account, including the notes in question as items. And, as the bank is in the actual possession of these notes, it is to be presumed that it relied upon them, as one of its securities. But, further,

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
*vs.*
BANK U. S.

it is an admitted fact, that the bank actually re-gulates the amount of its discounts, in part, by the average amount of the deposits it receives. It is further an admitted fact, that the bank is ac-customed to appropriate any money that may be standing to the credit of a customer on its books, (and the whole *must* be equally *a deposit*) to the payment of any of his notes, that may have be-come payable without being redeemed by him in time, and it is well known that discounts are refused for those whose deposits are made in another bank. There is then, in favor of the claim of the defendants, equal equity—equal presump-tion of a contract from the usage and practice of the bank, and from the manner of dealing, be-tween the parties, to that in favor of the lien of a factor or a banker.. And where there is the like reason there should be the like law.

To the claim of the defendants two leading objections are made,

1. That the notes in question are a deposit, and. that to a demand of a deposit a plea of compen-sation is inadmissible,

2. That as they were lodged in the bank for a special purpose, they cannot be detained as a security for the general balance due from the in-solvents' estate.

To the first objection, it may be answered that, notwithstanding all the imposition of a name, the bailment of these notes to the defendants, though

Spring 1811.
First District.

Amelungs'
Syndics
vs.
Bank U. S.

in some points resembling it, is nevertheless not a pure and strict deposit.

"A deposit" is defined by Sir Wm. Jones to be " a naked bailment, without reward, of goods to be kept for the bailor." The undertaking of the depositary is a benevolent and friendly act. The essential object of the deposit is that it be kept, and exclusively for the benefit of the depositor, and, of course, subject to be restored upon his demand. From the disinterestedness and benevolence of the depositary in assuming the trust, the law, on the one hand holds him responsible only for such gross neglect as is an evidence of fraud, and on the other, will not suffer him to refuse to restore the deposit, on the plea of compensation. The sacredness of the trust would be prophaned if the depositary were to think of withholding what had been confided to him, on account of any preexisting debt. The exalted purity of the motive, in accepting the confidence, in the eye of the law, refuses to mingle with any interested thought. Let us inquire then, what are the points of resemblance and of dissimilitude between what are called acts of deposit in the bank and the contract of pure and strict deposit. Like it, they are received without any direct hire, or reward, to be paid for their being kept, though they are to be safely kept—like it also, they are, by the rules of the bank, held in general subject to the order of him by whom they

Tt

SPRING 1811. are made—and they are made, too, in part for the
First District.
purpose of being kept, and so far, also resemble
AMELUNGS' a true deposit.    But this is the utmost reach of
SYNDICS
vs. the resemblance.
BANK U. S.
THEY differ in the following respects :

THEY are not lodged in the bank [by its cus-
tomers at least, and with such only, can the ques-
tion of lien arise,] for the purpose, *solely*, of being
kept.

2. Though no direct hire nor reward be paid
for the diligence bestowed in keeping them, they
are nevertheless not the object of a gratuitous, be-
nevolent contract, exclusively for the benefit of
the depositor, but, of an interested contract, for
the benefit of both parties.

3. The bank would be responsible for less
than gross neglect, which is the sole measure of
the responsibility of a real depositary.

IN order to see in a clear light the character of
the contract that subsists between the bank and
its customers, in making and receiving their de-
posits, it will be well to recur to the nature and
objects of that institution.    It is a corporation
created by law for certain public purposes of
finance and trade, and, as conducive to those ob-
jects, for advancing, more immediately the pecu-
niary interests of the private individuals who have
become subscribers to the stock.    The exclusive
object of every member of that corporation, as
such, is simply to derive the largest possible in-

come from the capital he has invested in the stock.
This is effected by the discount of negotiable
paper, at a permitted interest, to as great an ex-
tent as their capital will allow.    As incident to,
and with the view of enabling themselves to ex-
tend, their operations of discounting, the bank is
made a safe and convenient place of deposit,
where they receive money, bullion, plate, &c. to
be kept according to the practice of banks, and
as is contemplated, and, perhaps, even required
by the act of incorporation.    1 *Laws of U. S.*
*p.* 289, *sec.* 10.    *Ib. p.* 292, *sect.* 15.   So far as
the receiving of deposits by the bank is not ex-
acted by the law—the motive of the corporation
in taking the charge of receiving them, can be
only to obtain a more extended fund with which
to carry on their banking operations—and it ap-
pears, that the bank does actually enlarge its
discounts beyond the amount that its own capital
alone would justify, in a certain proportion to
the average sum total of the deposits in its vaults.
And the value, it sets on the receipt of these de-
posits, appears in this, that it will measure its
discounts with a rather more sparing hand to
those, who are in the practice of diverting their
deposits into other banks, than it uses to its
standing customers.

On the other hand, every customer of the
bank, as he must occasionally need its aid, must
be desirous of augmenting, as much as possible,

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
vs.
BANK U. S.

his credit with it. And his deposits, so far at least as they are made in one bank in preference to another, may therefore be presumed to be made with the view of increasing that credit. Besides it is notorious, that the controul of money is sometimes borrowed with that object alone, and is confined to the mere advantage of having the money deposited in the name of the borrower.

To form then a just idea of the contract that arises from making what are called deposits in the bank, the whole nature, object and practice of the institution must be viewed in connexion. In this point of view, it is evidently merely incidental and accessary to the principal business of the bank, which is, that of drawing an interest from money by discounting negotiable paper. Partaking of the same nature, being its immediate offspring, having with it an inseparable existence, it must be subject to the same law. Is there, then, in the receipt of deposits by the bank, any thing of that disinterestedness and benevolence, which the law presumes to actuate the real depositary, and which form so distinguished a feature of the contract of deposit? Are the deposits received, exclusively, for the benefit of him, who makes them? Is not the bank responsible for more, than mere good faith in the discharge of its trust, and which is all, that can be exacted from the friendly depositary? Is not the contract founded on motives of mere interest, and, mutually beneficial to the parties?

WHAT is called depositing in the bank, may be not inaptly likened to certain deposits, improperly so called, which are made in consequence of, and as accessary to some other contract of a lucrative kind, and in which, though no direct recompense is made for the care and fidelity bestowed in discharging the trust, are, nevertheless, on account of their connexion with the principal contract, deemed to be founded on motives of interest, and for the mutual advantage of the parties, and in which, the person called depositary is bound to exert a greater degree of care than is required by mere good faith in the discharge of his trust, and who has a lien on the things deposited, for the fulfilment of the principal contract with him—such are the deposit of a trunk with an innkeeper or a ferryman, who derive their profits from the entertainment or transport of travellers, or the deposit of clothes, with a man who is paid for the use of his bath.

" WHEN the bailee, improperly called a depositary, " says Sir William Jones, speaking of the degrees of responsibility for neglect, " takes charge of goods *in consequence of* " some *lucrative* contract, he becomes answer- " rable for *ordinary* neglect ; since in truth, he " is a *conductor operis*, and *lets out* his mental " labor at a just price ; thus, when clothes are " left with a man who is paid for the use of his " bath, or a trunk with an inn-keeper, or his " servants, or with a ferry-man, the bailees are

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
vs.
BANK U. S.

" as much bound to indemnify the owners, if the
" goods be lost, or damaged through their want
" of *ordinary* circumspection, as if they were to
" receive a stipulated recompense for their at-
" tention and pains"—*Jones on Bailm.* 49, 50.
And of deposits with an inn-keeper, Pothier ob-
serves, " this contract *degenerates* from the or-
" dinary contract of deposit, in this respect,
" that, the inn-keeper takes charge of the deposit
" not, as in ordinary deposits, *from a motive*
" *of mere friendship* but as *a consequence of* his
" *condition* of inn-keeper and *in consideration* of
" the *profit* he draws from the travellers who
" lodge in his inn.

" ALTHOUGH, from this deposit separately
" considered, he receive no compensation, never-
" theless, as it is a consequence of the principal
" contract between the inn-keeper and the tra-
" veller, for lodging and for entertainment, which
" contract is, reciprocally an interested one, *et in*
" *quo utriusque contrahentis utilitas vertitur*; we
" may regard the deposit which ensues as a con-
" sequence of this contract, as a deposit *in quo*
" *vertitur utriusque contrahentis utilitas,* and
" which, of consequence, ought to hold the inn-
" keeper responsible for *slight* neglect." *Poth.
cont. de dépôt, p.* 84, 5, *ch.* 3. *sec.* 2. *du dépôt
d'hostellerie.*

IN as much, then, as the bank takes charge
of its deposits—not from any motive of mere
friendship—not exclusively for the benefit of its

customers—but, that, although it receives no direct recompense for its care, it has a real inte- rest, which is its sole motive in receiving them, and is bound to exert a higher degree of dil- igence in discharging its trust, than mere good faith demands—there must be an end of the ob- jection drawn from the rule, that the sacredness of a deposit shall not be prophaned by a refusal to restore it on the interested plea of compen- sation.

But it is said in the next place, that these notes cannot be detained by the bank, as a secu- rity for the payment of the general balance against the insolvents' estate—having been lodged in the bank for a *special purpose*.

This objection is at war with the facts in the case. They were lodged indeed for the purpose, in the first instance, of collection ( resembling therein, more a mandate than a deposit, which, however, does not vary the question ) but, that purpose was to terminate in a deposit of their va- lue, with the mass of money, that might be stand- ing to the credit of the insolvents, on the books of the bank. The whole of the money credited to a customer on the books of the bank, must be deemed to be, equally, money *deposited*—whether it be obtained by loan upon discount and not yet, drawn out—or, money, originally, deposited—or, the proceeds of notes, collected for him by the bank ;—for the whole forms one *undistinguished*

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
vs.
BANK U.S.

*mass*—the whole is passed equally to his *general credit*, and the whole is drawn out by him, in the same manner—by order at sight:—and there will be, hardly a question about the right of the bank (in case of the insolvency of a customer) to detain the *very money*, the specific "value received" that may have been discounted to him, and may have not, yet, been drawn out, as a security for the payment of the note that has been given for it.—As to this objection that the notes were lodged for a *special purpose*, take the case of *Jourdaine, assignee of a bankrupt* vs. *Lefevre and others—bankers*, 2 *Espin.* 66. The question was, as to the *lien* of the defendants, who were bankers, on a certain note, that had been paid into their house, by the bankrupt, the day before his failure. The defendants had kept *two* accounts with the bankrupt—one, a *cash* account, on which, the balance was in favor of the. bankrupt—the other a *discount* account, of which, the balance was against him, and, which two accounts, were distinct and separate. The note in question, when paid in, was *written short* in the *cash* account, of which, the balance was, already, *in favor* of the bankrupt—yet, Lord Kenyon decided, that the defendants had a *lien* on the note for the payment of the *general balance*. The expressions, *paid in*, must be merely technical, and cannot, therefore, vary the case;—for, as the note was placed to the cash account, on which the bankrupt was a creditor, it was evidently the inten-

tion of the prayer that it should not go towards
the extinguishment of that balance which was
against him—but be, as cash, subject to his order.

So much for the principle of the case—but
we rely

II. On authority.—In the *Ordinanza de Bilbao, p.* 137, *ch.* 17, *sect.* 27, it is provided that
" To avoid the doubts and differences which
" hitherto have been experienced as to the prefe-
" rence claimed on account of bonds, bills of ex-
" change, notes, merchandize and other things
" that may be found deposited with the insolvent,
" in confidence, or on commission, it is ordained
" that in future those creditors who shall satis-
" factorily prove that they had, in the hands of the
" insolvent, bonds, bills of exchange, drafts,
" jewels, merchandize or any other property, in
" packages, hogsheads or boxes, whole with
" their marks and numbers, or open and began
" to be sold, and that the same had been received
" by the insolvent, on commission or confiden-
" tially,—the president and consuls shall cause
" all such property to be delivered up, in the
" same state in which it is found, to the legal
" owners or to their order, on payment of the
" costs thereon : but if the owner of such pro-
" perty, in his account current with the insol-
" vent, be found to be in arrears, in consequence
" of advances made upon such effects, or in any
" other way, he shall, in the first place, refund the

U u

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
*vs.*
BANK U. S.

" amount he owes, before the property or effects " be delivered up."

IF the bank were insolvent, then unquestionably, this would be conclusive authority—and, certainly, that which is law, in favor of an insolvent's estate, must *mutatis mutandis*—be law against it.—*App. to Cooper's B. L.* xix.

*Livingston* for the plaintiffs. THIS is a suit brought by the syndics of a bankrupt for certain promissory notes, lodged by the bankrupt in the office of the bank of the U. S. in this city, for collection. They refuse to deliver them, alledging a right to apply the proceeds of these notes, to the payment of others, drawn by the bankrupt and discounted at the bank, which have been protested for non payment.—To determine on this alledged right, we must, first, ascertain the nature of the contract, by which the notes in question were placed in the custody of the bank. It has been likened to a contract of factorage, to a pledge, to a mandatory contract, to a deposit,—

LET us, first, determine what the contract was, and it will be then less difficult to determine to which class it ought to belong.—We have, on this point, no other evidence than that we can derive from the nature of the corporation, with which the bankrupt dealt and their general course of business, for it is not alledged there was any unusual stipulation between the parties, at the time these notes were deposited.

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
vs.
BANK U. S.

By the act incorporating the bank of the U. States, it is provided in the 15th section " that the directors may establish offices, wherever they think fit, within the U. S. for the purposes of *discount* and *deposit only*, and upon the same term, and in the same manner, as shall be practised at the bank"—"subject to such regulations as they shall deem proper." In another section, an office of discount and deposit was established at N. Orleans, and the following regulations, established for regulating the discounts and deposits. *

THESE notes, then, must, according to the terms of the law, have been either *deposited* or *discounted* at the bank, but, the latter is not pretended. Supposing, therefore, that the office in N. Orleans, have adhered to their instructions, and to the act of incorporation, we must say, then, the notes, according to the *letter* of the law, were a *deposit*. Where they not so, also, according to its spirit, and the intent of the parties to the contract? We have seen, that the office here, was opened for the two sole purposes of *discounting*, or in other words, *purchasing* bills, and receiving deposits of securities, specie and other valuable articles.—This last operation, is perfectly distinct from the former. Notes are purchased,

---

* These regulations have not been furnished to the reporter, but they were in substance, that money and other articles deposited should be restored *free from expence*, and that *discounts*, should be made on the credit of the drawers and indorsers.

SPRING 1811. not with any reference to, or on the credit of the
First District. deposits, but on the credit of the drawer and in-
AMELUNGS' dorsers.—The cash is deposited for safe keeping,
SYNDICS
*vs.* and for the ease of making payments.   It is held
BANK U. S. at the immediate will of the depositor, and must
be paid at the instant his drafts are presented.
It admits of no *compensation*, or set off, as it is
called in the English jurisprudence.   So, that
a person owing a thousand dollars to the bank, by
a protested note, and having a similar sum due
to him,  on his  deposit account, might draw for
it, and the bank must, according to the law,
which has been read, honor the draft.    *See part.*
5, *t.* 3, *l.* 5.

A note *deposited* in the same  situation, before
collection,  protest or discount,  is a strict regu-
lar deposit.   *Pothier, traité du dépôt.   Prel.*
*art.*   "A deposit is a contract, by which, one of
the parties gives an article to the other to keep for
him, who, on his part, takes charge of it gratui-
tously,  and  engages to restore it,  as soon as it
shall be demanded."—The same definition, is gi-
ves in substance in 5 *part.  t.* 3, *l.* 1.—*Dig.* 16.
3. 1. and in the civil code of this territory, *tit.*
11 *ch.* 2 *art.* 2,  the very words of Pothier's de-
finition are enacted  into a law.—Here,  the con-
tract in question comes within  every branch of
the definition.   The notes were " put into the
possession" of the bank—" gratuitously "—for
the purpose of safe keeping, and to be restored
on demand.

Spring 1811.
First District.
⎨⎯⎯⎯⎯⎬

Amelungs'
Syndics
*vs.*
Bank U. S

It is said, however, that this undertaking is not *gratuitous*, because the bank derive a *benefit*, and the customer a *credit*, from the deposit. This reasoning, if it apply at all, applies to deposits of specie, not of notes, for the bank can never increase its operations in consequence of an increased deposit of notes; they can never make use of them on pressing occasions as they can of specie. They must, by the terms of the contract, remain in the bank until called for by the owner, or until changed into specie (which represents them) by payment. A bank which should paesume to negociate notes or bills of exchange, left in the hands of its officers, would be guilty of a flagrant breach of trust, and perhaps of theft. Whereas, in case of a deposit of money, the bank may make use of it : it may pass through a thousand hands, without any breach of trust, for the only obligation the bank contracts is to restore an *equal sum* and not the *same money* that was deposited.—The first is a *regular*, the other *an irregular*, deposit ; a distinction familar in the civil law.

All manner of things may be given in deposit—that only is a deposit where no price or hire is taken for keeping them—if any thing should be taken, it would be an hiring. "And it is declared that the property and possession of the thing deposited does not pass to the depositary, unless it be of those things which consist in *number*, *weight* or *measure*, for then the property passes,

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
vs.
BANK U. S.

but the depositary is bound to return the same thing or another as good and of the same kind as that deposited." *Feb. 2. p. l. 3. c. 3, s. 2. n.* 200.

" THAT is a *regular* deposit which is made of any thing which does not consist in number, weight or measure ; or if it be money, it is enclosed in a purse, bag or any other thing sealed or locked, and which is given to the depositary not that he should *use* but that he should *keep* it, and therefore he is obliged to return the *same thing*, and not another, although it be of equal quality and value, under the penalties of theft and those I mentioned in my third point," &c. *Ib. no.* 201. " A deposit, called irregular, is that, which is made of money or any other thing consisting in number, weight or measure, as wheat, wine, &c. and which are not delivered to the depositary jocked up, sealed or marked, so as to shew that they are the same, and of which the use is not prohibited, but only the obligation contracted to restore them or others of equal quality and value, in number and weight. Because the depositor does not preserve his *dominium*, which is transferred to the depositary, who may negociate with and use them to his own advantage, and if they are lost by *accident*, they are at his risque, not at that of the depositor. The *reverse* of which is the case in a *regular deposit*."

THIS being a deposit of securities, not of money, is a *regular* deposit, which does not, ac-

cording to the authorities cited, transfer the pos- session or property to the depositary, both of which remain in the depositor, and therefore the bank cannot pretend to take away the *gratuitous* character of the transaction, by saying that they derive an advantage from it, because they cannot derive that advantage without violating a trust.— As little can the increase of *credit*, given to the depositor from the generality of his deposits, al-ter the nature of the contract.—If it should in-crease his credit, it can only be because it is an evidence of his ability to pay—but not from any *obligation* which the bank contract to increase his credit in proportion to his deposit; but, if there is no *obligation*, there is no *contract*, and if there be no contract, it follows that there is no other advantage to the depositor, than that arising from a strict deposit. Therefore, the contract is, *gratuitous*, as far as respects the depositor, and we have seen that it is so, with respect to the de-positary.

It is also, for the purpose of *safe keeping*, which is another of the characters of the defi-nition : for, the cashier, on being examined to this point, declared, that the person depositing fre-quently withdrew them before they became due, and the bank never pretended to control him in this use of his property.—This, therefore, has all the characteristics of a *regular deposit.*— What are its effects, as to the right claimed by the defendants of retaining the deposit, as a set

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
vs.
BANK U.S.

off for other debts ?—Here, the answer is precise. A positive statute declares, *(part. 5, tit. 3 l. 5,)* " *tenudo es el que rescibe la cosa en guarda, e sus herederos de la tornar à aquel que la dio à guardar, o à los que heredassen lo suyo, cada que la demandassen, e maguer que le ouiesse à dar alguna cosa, aquel que la encomendassen : con todo esso, non que la debe tener, el que rescibio el condessijo por razon de prenda, à que decer en latin,* COMPENSATIO, *que quiere tanto decir, como descontar una deuda por otra ; ante debele luego entregar de ella ; e despues de esto, puedele demandar aquello que le debiere.*"—The simple and antiquated language of this law is very strong.— He, who hath received a thing in keeping, and his heirs, are bound to return it to him, or to his heirs, who gave it him to keep, *whenever* they shall demand it, and that altho' the depositor *may be indebted to him* ; for all this, he, who hath received the deposit, cannot retain it as a *pledge*, or on account of what in latin is called *compensatio*, which, means the setting off of one debt against another—but, *first, he must deliver the deposit*, and, afterwards, he may demand that which is due to him." Nor can the deposit be retained, even for the expences attending its custody.

*Febrero, c. 4. s. 3, n. 47.* " The depositary or his heirs, must restore the deposit, altho' the owner may be his debtor, nor can he retain it, as a compensation, as a pledge, or in any other

manner, but, he is obliged to restore it imme-
diately on demand,—and if he refuse the delivery,
without just cause, he incurs the penalties of
theft."

THIS explicit language of positive law makes
all answer to the reasonings, from the British
cases, unnecessary. They form the law of En-
gland, as applied to the circumstances of the se-
veral cases cited, but can have no bearing on a
case arising here, where we are governed by
other laws.—Indeed, they are all, without ex-
ception, adjudicated in conformity to the special
*usage* of the different trades in which they arose.

A sufficient answer to the argument drawn
from the 27th article of the ordinance of Bilboa,
is that the article produces a special remedy for a
case which is not the one now before the court. It
alters the general law I have quoted, by giving a
set off *in favor* of the creditors of a bankrupt
*depositary*, but it makes no change where the *de-
positor* is the bankrupt. That case is left to the
operation of the general laws I have quoted, and
as has been seen, they expressly direct there
shall be no set off.

*By the Court.* Whether there be a general
balance of account, due from the insolvents to
the defendants, is a question which is to be
determined by the nature of the dealings and
transactions between the parties ; not from the

Xx

AMELUNGS'
SYNDICS
*vs.*
BANK U. S.

manner in which the defendants have made entries in their books.

THE Bank of the United States, and it is believed, like it, every other incorporated bank in these states, carry on business in a manner quite different, than English bankers do. The latter make actual loans and advances of money to their customers, the American banks deal no otherwise, in advances of money, than by discounting or purchasing bills or notes. Cash is obtained from the defendants on contracts *executed :* never on an *executory* one. On the discount being effected, the net proceeds of the note are instantly placed to the credit of the person presenting it, as if he had actually deposited the specie : and when the day of payment arrives, they present *always a note, never an account,* for payment : so that they never are creditors of a balance of account. They cannot, therefore, successfully invoke the principles, on which factors and others are allowed to retain the property of their principals, for the payment of the general balance of their accounts.

THE claim, which the defendants have on the insolvents, arises, therefore, on their notes, discounted for their (the insolvents') benefit, or that of other persons. As to the notes which were discounted for the benefit of the insolvents, the discount was effected, according to the rules of the bank, ( art. 4, pages 17-50) *on* PERSONAL

*security only, with at least, two responsible na-*

*mes.* It cannot be pretended, that the insolvents

impliedly assented to the lenders having any security, in addition to that on which the money was obtained.—The defendants, therefore, have no lien on any property of the insolvents, which, at the time of the discount, happened to be in their hands, or has fallen into them since—unless they are intitled thereto, under the ordinance of Bilboa.

As to notes of the insolvents, which were discounted, for the benefit of other persons, the defendants are much less founded in claiming the lien.

WITH regard to the defendants' right of setting off the debt, due them by the insolvents, against the claim of the plaintiffs, it appears to the court, that, from the nature of that claim and the things which are the object of it, no set off, or compensation can be admitted against it.

BY the 4th article of the regulations of the bank, (pages 22-79) on the faith of which the notes in dispute were placed in the defendants' hands, " notes or bills *deposited* for collection..... shall remain subject to the order of the depositor, as is provided in cases of other deposits." The bank (id. pages 28-109) " shall take charge of the cash......shall receive deposits of ingots of gold, &c. and return them, on demand, to the depositor."

SPRING 1811.
First District.

AMELUNGS'
SYNDICS
vs.
BANK U. S.

THE defendants, in all these cases, being de-positaries, cannot oppose any set off or compensation against the claim of the deposit. *In causa depositi compensationi locus non est.* *Paul sent.* 11. 12. 13.

*Pothier* thinks that this is to be understood of an *irregular* deposit, such as is spoken of in the laws 24. 25. *s.* 1. and 26. *s.* 1 *ff. depos.* by which, (like in deposits of money in a bank) one gives, in trust to another, a sum of money to be put with other sums, deposited by other persons, and return, not the same pieces, but the same sum. For, in the case of a *regular* deposit, as that of a bag sealed, an ingot of gold or the like, no set off or compensation can be opposed, not only because a deposit is claimed, but on account of the general rule, that on claims of a thing certain, no set off or compensation is to be admitted. 2 *Pothier on obligations* 95.

THE ordinance of Bilbao is not applicable to the present case. It does not expressly reach it and we cannot extend it by implication : for the cases are not parallel. If I deposit my goods in a merchant's warehouse, I hereby give him credit and induce others, who are ignorant of the nature of the bailment, by which he acquires the possession of them, to place a greater confidence in the depositary, than they otherwise would—while, if I deposit them with my creditor, he cannot be deceived and extend credit to me on

that account, for he knows that his, is my pos- session and that his precarious hold *will not* avail him, if he make advances to me.

JUDGMENT FOR THE PLAINTIFFS.